Filed 10/16/14  P. v. Shaffer CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>DEMETRIUS SHAFFER,<br><br>        Defendant and Appellant. | C070459<br><br>(Super. Ct. No. 11F01592) |

In the early morning hours of Thanksgiving 2010, defendant Demetrius Shaffer went to the apartment of T.T., who was alone there.  Over the next three hours, he committed several sexual offenses against her, including oral copulation, genital penetration, and rape.  A few weeks later, in the early morning hours of New Year's Day 2011, defendant attacked R.S., sexually penetrated her anus, and strangled her to death.

Convicted of multiple crimes against T.T. and R.S., including the special-circumstance murder of R.S., and sentenced to life without possibility of parole plus other life terms, defendant appeals.  He contends:  (1) the trial court prejudicially erred in

1

denying his motion to sever trial on the charges, (2) there was insufficient evidence of anal penetration with respect to R.S., (3) the jury instruction about prior uncharged sexual offenses permitted an irrational inference, (4) a jury instruction diluted the People's burden of proof on third party culpability, (5) defendant's trial attorney violated his right to counsel by not requesting an instruction on third party culpability, (6) there was insufficient evidence of lack of consent for some of the offense against T.T., (7) the evidence did not support one of the convictions for oral copulation against T.T., (8) defendant's trial attorney violated his right to counsel by allowing the People to establish one of the rapes of T.T. using inadmissible hearsay, and (9) an instruction should have been given to the jury requiring it to determine inconsistency before using a prior statement.

We conclude defendant's contentions are without merit except that defendant's trial attorney violated his right to counsel by allowing the People to establish one of the rapes of T.T. using only inadmissible hearsay. As a result, we must strike the conviction on that rape count and the accompanying sentence. With that modification, we affirm the judgment.

PROCEDURE

The District Attorney charged defendant by information as follows:

- Count one:    murder of R.S. (Pen. Code, § 187, subd. (a); hereafter, unspecified code citations are to the Penal Code) with special circumstances of rape (§ 190.2, subd. (a)(17)) and anal penetration (§ 190.2, subd. (a)(17));
- Count two:    anal penetration of R.S. (§ 289, subd. (a)(1));
- Count three: oral copulation of T.T. (§ 288a, subd. (c)(2));
- Count four:   genital penetration of T.T. (§ 289, subd. (a)(2));
- Count five:    oral copulation of T.T. (§ 288a, subd. (c)(2));
- Count six:     oral copulation of T.T. (§ 288a, subd. (c)(2));
- Count seven: rape of T.T. (§ 261, subd. (a)(2));

2

- Count eight: rape of T.T. (§ 261, subd. (a)(2)); and
- Count nine: rape of T.T. (§ 261, subd. (a)(2)).

The jury found defendant guilty on all counts. On count one, the jury found the rape special circumstance not true, but found the anal penetration special circumstance true.

The court sentenced defendant to life without possibility of parole on count one and imposed and stayed under section 654 a 15-year-to-life term on count two. The court imposed consecutive terms of 15 years to life on counts three through nine. The total term imposed was life without possibility of parole, plus 105 years to life.

FACTS

Defendant's crimes occurred on Thanksgiving Day 2010 against T.T. (counts three through nine) and New Year's Day 2011 against R.S. (counts one & two). The defense strategy differed between the two victims – as to T.T., defendant primarily claimed the encounter was consensual and, as to R.S., defendant claimed that he was not the perpetrator. We provide a brief summary of the crimes here, and we recount the facts in greater detail in connection with defendant's sufficiency-of-evidence and other contentions.

*T.T. on Thanksgiving Day*

Defendant went to T.T.'s apartment at approximately 3:00 a.m. on Thanksgiving. T.T. had previously been introduced to defendant, with whom she was on friendly terms, and let him in after he knocked. After a brief conversation, defendant suddenly grabbed T.T. by the neck causing her difficulty in breathing, threw her against the wall, and said, "Bitch, you gonna give me some pussy." Defendant threw T.T. to the floor, told her to pull her shirt up, told her to keep her hands on her breasts, and orally copulated her.

After this initial attack during which defendant choked T.T. and threw her against the wall and on the floor, defendant moved T.T. to a couch where defendant put his finger in T.T.'s vagina at least twice. He made her orally copulate him, during which she

3

changed the manner in which she was orally copulating him to make him think she was enjoying it. He inserted his penis in her vagina at least twice.

Fearing for her life, T.T. went into "survival mode" and decided to pretend that everything defendant was doing was okay. Defendant was in T.T.'s apartment for about three hours. Toward the end of that time, several people came to the apartment, but T.T. did not ask for help because she did not want to get those people involved and she wanted to maintain defendant's trust.

*R.S. on New Year's Day*

On New Year's morning 2011, the partially nude body of R.S. was found on the ground at the corner of Mills Park Drive and Folsom Boulevard in Rancho Cordova, close to the Rancho Club Casino. A pair of blue pants covered her face. She had a pink, powdery substance on her abdomen. When her body was lifted, the same powdery substance was on her back, and there was a broken makeup compact on the ground under her.

The cause of death was determined to be ligature strangulation.

Defendant's DNA was found on R.S.'s neck where there was bruising, on R.S.'s right breast, on R.S.'s abdomen, and under her fingernails. A hair, probably a pubic hair, identified as being from defendant, was found on R.S.'s sternum.

Other evidence connected defendant to R.S. on New Year's morning.

At about 12:30 on New Year's morning, R.S. arrived at Michele Gaylord's apartment where they talked and smoked methamphetamine. Later, defendant also arrived at Gaylord's apartment. Defendant and R.S. went into Gaylord's bedroom together. About five minutes after defendant and R.S. went into the bedroom, Gaylord went into the room to see what they were doing. Defendant was sitting on the bed, and R.S. was standing at the foot of the bed. They were not touching each other. They were talking and were fully clothed.

4

Gaylord left the room, and, five minutes later, R.S. opened the door and invited Gaylord into the room to smoke methamphetamine. Defendant and R.S. were still fully dressed.

Defendant left the apartment soon after that. R.S. stayed for awhile then left around 3:30 a.m.

At 3:30 a.m., defendant and R.S. entered the Rancho Club Casino together and went to a blackjack table. At 3:39 a.m., defendant and R.S. left the casino together. These movements were recorded on the casino's video surveillance system.

Defendant was interviewed by detectives of the Sacramento County Sheriff's Department on January 4, 2011, three days after R.S.'s body was found. At first, defendant admitted being at Gaylord's with R.S. on New Year's morning and going to the casino together, but he denied having sexual relations with R.S. Defendant also claimed that they left the casino separately that morning. The detective pressed defendant about why his DNA would be found on her, and he continued to claim there were no sexual relations.

Later in the interview when the detectives continued to press defendant about his DNA being on R.S. when she was found, defendant claimed that at Gaylord's apartment he sucked on R.S.'s breasts and fondled her vagina.

Defendant claimed that he was not with R.S. after they left the casino. A detective told defendant that they had cameras, including by a gray utility box where R.S.'s body was found. After a cigarette break, defendant told the detectives that he and R.S. left the casino together and went to where she was killed. They talked there for a minute, defendant gave her some methamphetamine, and he left. He denied killing her.

Defendant relied for his defense on evidence that connected three other men to R.S.

5

The pants found over R.S.'s face belonged to Marvin Darrell Pierce, Jr. Analysis of the pants found Pierce's DNA on the pants. There was other DNA on the pants, but it could not be matched to anyone involved in this case.

Pierce testified that he was homeless and suffered from fecal incontinence. He had soiled the pants, and they no longer fit him, so he got rid of them by throwing them over a barrier on Mills Park Drive a few days before R.S. was murdered.

Pierce and R.S. were friends, but they never had sexual relations. On New Year's Eve, Pierce saw Gaylord and R.S. at a bar before midnight. He gave her a kiss on the cheek. He left the bar and did not see R.S. again that night. Starting at about midnight, he slept in a friend's car in the parking lot of the Rancho Club Casino.

In addition to defendant's DNA, two other men's DNA was found on R.S.'s body. George Nixon was a minor contributor of DNA found on R.S.'s right breast, and John Meacham may have been included in DNA under R.S.'s fingernail. While defendant's DNA was found in the area of bruising on R.S.'s neck, the DNA of neither Nixon nor Meacham was found there.

Lakeshia Whittaker was arrested for shoplifting on January 19, 2011. She told the arresting officer that she had information concerning a recent homicide. She testified at trial that she made that statement because she hoped to get out of jail and also wanted the police to find the real killer. Whittaker met with a detective and told him that she heard Nixon, whom she knew as "G-Bone," say that he had killed R.S. and dumped her body after he and other men had sex with her. During her interview, however, she was inconsistent about when she heard Nixon. She asked the detective for leniency in exchange for the information.

On February 2, 2011, Whittaker was again arrested for shoplifting. On the way to the jail, she pointed out a house and claimed there was drug activity there. (The claim turned out to be unfounded.) She also told the officer she wanted to provide information about a homicide in exchange for leniency.

6

On October 27, 2011, Whittaker spoke to a defense investigator. She claimed that she did not know who killed R.S. and that she did not tell any detectives that Nixon did it. She said Nixon's name had come up because he had been seeing R.S.

On November 16, 2011, Whittaker was arrested on a warrant. She told a detective and a prosecutor that she had not heard Nixon say he killed R.S. She heard through the rumor mill that he had killed her.

At trial, Whittaker testified that she heard Nixon say, on January 1, 2011, that he had killed R.S. Whittaker admitted that she was addicted to methamphetamine, which makes her hallucinate and become delusional and affects her ability to remember things. She was willing to steal and lie to support her addiction. She had multiple prior convictions, including for petty theft, burglary, and forgery. And she was high on methamphetamine when she heard Nixon say he killed R.S.

Nixon testified that he had been dating R.S. shortly before her death. They had sexual relations on December 30 or 31, 2011. He saw R.S. at a mutual friend's apartment around 1:30 on New Year's morning. Nixon left the apartment approximately 15 minutes later, and that was the last time he saw R.S. He denied killing R.S. or telling anyone that he killed R.S.

## DISCUSSION

### I

*Joinder*

Defendant contends that the trial court prejudicially abused its discretion by denying his motion to sever for separate trials the counts alleging crimes against T.T. and R.S. The contention is without merit because the crimes were of the same class and were cross-admissible.

When defense counsel made the motion to sever, he said: "I think the strongest argument in favor of severing the [T.T.] case from the [R.S.] case is the fact that we're dealing with a weak case, which I believe is the [R.S.] case." Counsel went on to explain

7

that the T.T. rape case was stronger and that the evidence that defendant choked T.T. would be used by the jury to conclude that defendant also choked R.S.

The trial court denied the motion to sever based on the cross-admissibility of evidence of the crimes. It noted the probative value of the similarities in the cases, such as pulling the shirt up over the breasts and choking the victim.[1]

Section 954 permits the joinder of "two or more different offenses of the same class of crimes or offenses." The law favors joinder of counts because it promotes efficiency. (*People v. Myles* (2012) 53 Cal.4th 1181, 1200.) Even when joinder is proper, the trial court may, "in the interests of justice and for good cause shown," exercise its discretion to order that different offenses or counts be tried separately. (§ 954; see *People v. Thomas* (2012) 53 Cal.4th 771, 798.) " ' "The burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried." [Citation.]' " (*People v. Bradford* (1997) 15 Cal.4th 1229, 1315.)

If the trial court denies a motion to sever, the ruling is reviewed on appeal for abuse of discretion. (*People v. Ramirez* (2006) 39 Cal.4th 398, 439.) In determining whether a trial court abused its discretion, we consider the record before the trial court when it made its ruling. (*People v. Thomas, supra,* 53 Cal.4th at p. 798.) "We consider first whether the evidence of the two sets of offenses would have been cross-admissible if the offenses had been separately tried. [Citation.] *If the evidence would have been cross-admissible, then joinder of the charges was not prejudicial.*" (*Ibid*., italics added.)

_____

[1]    Later, during trial, the court admitted evidence of the rape and murder of R.S. (as well as other prior sexual misconduct against other women) to establish intent, lack of consent, and motive in the rape of T.T., but the court excluded the same evidence to prove a common design or plan, holding that there were insufficient similarities.

8

On appeal, defendant argues that joinder was improper because it allowed the prosecution to try together two relatively weak cases. He also argues that the evidence of the crimes was not cross-admissible.

Joinder was permitted here under section 954 because the offenses against T.T. and R.S. were assaultive. Murder and rape are of the same class of crimes because they are both assaultive crimes against the person. (*People v. Maury* (2003) 30 Cal.4th 342, 395.)

Furthermore, the crimes against T.T. and R.S. were cross-admissible on the issue of defendant's intent, which means that defendant cannot show a prejudicial abuse of discretion in the trial court's denial of his motion to sever.

Evidence Code section 1101, subdivision (a) prohibits the use of evidence of a person's character, including evidence of character as manifested in uncharged conduct, to prove conduct on a specific occasion. The Evidence Code, however, recognizes that evidence of other criminal acts can be relevant for reasons other than to prove bad character. Under subdivision (b) of section 1101, evidence of criminal acts otherwise excludable under subdivision (a) may be admitted if the acts are "relevant to prove some fact . . . other than [the defendant's] disposition to commit [a criminal] act." Evidence is most commonly admitted under subdivision (b) to prove (1) motive or intent, (2) a common design or plan between the uncharged and charged crimes, and (3) identity. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402-403 & fn. 6 (*Ewoldt*).)

In order to justify admission under Evidence Code section 1101, the uncharged conduct must bear some resemblance to the charged crime, although the requisite degree of similarity varies depending on the purpose for which the evidence is admitted. (*Ewoldt, supra,* 7 Cal.4th at p. 402.) "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental

9

state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' [Citation.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]" (*Ibid.*)

Defendant argued at trial, as he does again on appeal, that the rape charges against him regarding T.T. were unfounded because T.T. consented to the sexual activity. In other words, defendant denied that he intended to commit the acts against T.T.'s will. The sexual attack on R.S., therefore, was probative on the issue of defendant's intent with T.T. – that is, to violently commit sexual offenses against the victim's will.

"[A] fact finder properly may consider admissible 'other crimes' evidence to prove intent, so long as (1) the evidence is sufficient to sustain a finding that the defendant committed both sets of crimes [citations], and further (2) the threshold standard articulated in *Ewoldt* can be satisfied – that is, 'the factual similarities among the charges tend to demonstrate that in each instance the perpetrator harbored' the requisite intent. [Citation.]" (*People v. Soper* (2009) 45 Cal.4th 759, 778.)

As the trial court noted, the circumstances of the attacks on T.T. and R.S. were similar. Defendant violently attacked an isolated victim. The victim's shirt was pulled up over her breasts. And the victim was choked. These circumstances were sufficiently similar to allow the trial court to admit the evidence of the rape and murder of R.S. to prove defendant's intent with respect to the rape of T.T.

Both women were acquaintances of defendant, and defendant had obtained their confidence before sexually assaulting them. This is particularly significant when defendant claims consent as to one of the victims. Defendant gained T.T.'s confidence just like he gained R.S.'s. Defendant used that confidence to gain access into T.T.'s apartment, as well as to isolate R.S.

10

Defendant also argues that, even if the evidence was admissible under Evidence Code section 1101, subdivision (a), the evidence of the rape and murder of R.S. would have been excluded in a hypothetical separate trial on the rape of T.T. under Evidence Code section 352 because (1) the rape and murder of R.S. was "exponentially more inflammatory" than the rape of T.T., (2) the evidence would have confused the jury, and (3) it would have consumed too much time. We disagree.

The evidence of the rape and murder of R.S. was highly relevant on the issue of intent regarding the rape of T.T. Consent was the main issue litigated as to the rape of T.T., and, as discussed, the evidence of the rape and murder of R.S., along with other evidence, supported an inference that the rape of T.T. was nonconsensual. The fact that there was also a murder involved as to R.S. does not lead to a conclusion that the prejudicial effect of the R.S. evidence would have substantially outweighed its probative value. (Evid. Code, § 352.) The attacks were both sexual assaults involving choking of the victim. The admission of the evidence concerning the rape and murder of R.S. would not have confused a well-instructed jury in the trial on the rape of T.T. And the trial court's decision to admit the evidence despite the time it would have taken to present the evidence would not have been an abuse of discretion.

The evidence was also cross-admissible on an Evidence Code section 1108 theory to establish propensity. (See *People v. Medina* (2003) 114 Cal.App.4th 897, 902 [subsequent act admissible under Evid. Code, § 1108].)

Since the evidence of the rape and murder of R.S. would have been properly admitted at a hypothetical separate trial on the charges of the rape of T.T., cross-admissibility is established, and it is unnecessary to consider whether the evidence of the rape of T.T. would have been properly admitted at a hypothetical separate trial on the charges of the rape and murder of R.S. (See *People v. Zambrano* (2007) 41 Cal.4th 1082, 1129.)

11

Because the crimes were cross-admissible, we need not consider the other factors a trial court may consider in determining the propriety of joinder. (See *People v. Soper, supra,* 45 Cal.4th at pp. 774-775 [cross-admissibility normally sufficient to dispel suggestion of prejudice in joinder].) The trial court did not abuse its discretion in denying the motion to sever.

Defendant argues that, even if the trial court did not abuse its discretion in denying the motion to sever, the joinder of the charges actually resulted in gross unfairness amounting to a denial of his due process rights. We disagree.

Even if the trial court's pretrial ruling denying a motion to sever was correct when made, we must reverse if the defendant shows joinder actually resulted in gross unfairness, amounting to a denial of due process. (*People v. Arias* (1996) 13 Cal.4th 92, 127.)

Here, there was no gross unfairness. Defendant attempts to show that some of the prosecution evidence that seemed stronger before trial actually did not have as much probative value as anticipated at trial. Based on this analysis, he claims that the joinder resulted in gross unfairness because it allowed the jury to rely on the aggregate evidence of the crimes to convict rather than considering the evidence as to each crime by itself. To the contrary, because the evidence of the crimes was cross-admissible, joining them did not result in gross unfairness. *(People v. Ochoa* (1998) 19 Cal.4th 353, 409-410.) In any event, as summarized in the review of facts above and discussed later with respect to defendant's substantial evidence contentions, the evidence was not as weak as defendant contends.

II

*Sufficiency of Evidence of Attempted or Completed Anal Penetration*

The jury convicted defendant of first degree murder of R.S. with a special circumstance that the murder was committed while attempting or completing sexual penetration of the anus. He was also convicted of a separate count of sexual penetration

12

of the anus.  Defendant contends that the evidence presented at trial was insufficient to sustain the jury's finding that defendant attempted or completed a penetration of R.S.'s anus.  The contention is without merit.

" 'In considering a claim of insufficiency of evidence, a reviewing court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citations.]' [Citation.] 'The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.]' [Citation.] 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt.' [Citation.] Simply put, if the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citations.]" (*People v. Farnam* (2002) 28 Cal.4th 107, 142-143 (*Farnam*), italics omitted.)

"Lack of trauma to a victim's rectum does not preclude a finding that the victim was sodomized. [Citation.]" (*Farnam, supra,* 28 Cal.4th at p. 144.) As noted, we look at all the evidence in determining whether attempted or completed anal penetration took place.

A forensic pathologist testified that R.S. had superficial tears in the tissue around her anus.  She found no sperm in that area.  In her written findings, the pathologist concluded that the tears were "suspicious for sexual assault."  She noted that hard stool could have caused the damage, but that the stool in R.S.'s body was soft.

Defendant argues that "[i]f the sole basis for a criminal charge is expert medical opinion, and the medical expert cannot even make a finding to support the charge on a preponderance of evidence, but can only state a suspicion, no reasonable jury can make a

13

finding of guilt beyond a reasonable doubt." This is a reasonable statement of law on its face, but it does not reflect the evidence in this case on which we rely to determine whether it was sufficient to sustain a finding that defendant attempted or completed anal penetration.

The evidence concerning the attack on R.S. must be considered as a whole. R.S. was found in a condition suggesting she had been subject to a sexual attack. She was partially nude, and defendant's DNA and hair were found on her body in locations suggesting sexual activity. R.S. was found on her back, and underneath her was a broken compact makeup case with powder. The same powder was found on her abdomen, which indicated that she had been on her stomach during the attack. Therefore, R.S. was attacked sexually, and at least some of the time she was on her stomach. Together with the expert testimony that she had tears in the tissue of her anus, this evidence was sufficient to sustain a finding that defendant penetrated R.S.'s anus during the attack.

Even if the evidence in this case of injuries to the victim's anus was not sufficient by itself to sustain the finding that defendant attempted or completed anal penetration, it is sufficient together with the rest of the evidence. The injuries were consistent with anal penetration, or attempted penetration, even if they were not conclusive. Therefore, defendant's contention that the evidence was insufficient to sustain a jury finding that defendant penetrated or attempted to penetrate R.S.'s anus is without merit.

III

*Permissive Inference of Propensity to Commit Sexual Offenses*

Defendant contends that the court's instruction to the jury concerning use of propensity evidence (CALCRIM No. 1191) allowed the jury to make an irrational permissive inference, thus violating his due process rights. We conclude that the inference permitted by the instruction was not irrational and, therefore, defendant's due process rights were not violated.

14

A.    *Background*

At trial, the prosecution introduced the testimony of three of defendant's former wives concerning sexual offenses he committed against them when they were married. I.M. testified that defendant hit her, pinned her down, and choked her at times. Between 10 and 15 times, he also forced himself on her sexually. M.A. testified that defendant choked her at times. He forced himself on her sexually many times. One time, he did so after he beat her up all day in front of his cousins. T.B. testified that defendant subdued her by choking her before committing sexual offenses. Defendant believed that a wife does not have the right to say no but must submit to her husband.

Evidence Code section 1108 allows evidence of a defendant's uncharged sexual offense to establish the defendant's propensity to commit sexual offenses. (*People v. Falsetta* (1999) 21 Cal.4th 903, 907.) Consistent with Evidence Code section 1108, the trial court instructed the jury using CALCRIM No. 1191. The second to the last paragraph of the court's instruction was as follows (with the part defendant finds objectionable in italics):

"If you decide that the defendant committed the uncharged [forcible spousal rape] offenses, *you may*, but are not required to, *conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit the sexual offenses charged here.* If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the sexual offenses charged. The People must still prove the charge beyond a reasonable doubt."

B.    *Evidence Code section 1108 and Due Process*

The California Supreme Court has held that admission of propensity evidence under Evidence Code section 1108 does not violate due process and fair trial rights. (See

15

*People v. Reliford* (2003) 29 Cal.4th 1007, 1012-1016; *People v. Falsetta, supra,* 21 Cal.4th at pp. 910-922; see also *People v. Schnabel* (2007) 150 Cal.App.4th 83, 87 [relating specifically to CALCRIM No. 1191].)

California courts have also held that to be admissible under Evidence Code section 1108, evidence of prior uncharged sexual offenses need not be similar in their facts to the sexual offense currently charged. To allow the inference the defendant has a propensity to commit sexual offenses, it is enough that he committed sexual offenses in the past. "The charged and uncharged crimes need not be sufficiently similar that evidence of the latter would be admissible under Evidence Code section 1101, otherwise Evidence Code section 1108 would serve no purpose. It is enough the charged and uncharged offenses are sex offenses as defined in section 1108." (*People v. Frazier* (2001) 89 Cal.App.4th 30, 40-41, fn. omitted; see also *People v. Mullens* (2004) 119 Cal.App.4th 648, 659.)

C.  *Constitutionality of CALCRIM No. 1191 in this Case*

CALCRIM No. 1191 allowed the jury to draw an inference based on the prior uncharged sexual offenses that he had a propensity to commit sexual offenses. This type of inference (a permissive inference) violates a defendant's due process rights if it cannot be said "with substantial assurance" that the inferred fact is "more likely than not to flow from the proved fact on which it is made to depend." (*County Court of Ulster County v. Allen* (1979) 442 U.S. 140, 166, fn. 28 [60 L.Ed.2d 777, 798].) The California Supreme Court has stated that " '[a] permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury.' " (*People v. Mendoza* (2000) 24 Cal.4th 130, 180, quoting *Francis v. Franklin* (1985) 471 U.S. 307, 314-315 [85 L.Ed.2d 344, 353-354].) A permissive inference is constitutionally invalid "only if there is no rational way the jury could draw the permitted inference." (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1243-1244.)

Defendant's contention is a variation on the argument that prior uncharged offenses must be sufficiently similar to the current offense to allow admission. He claims that the instruction, which does nothing more than apprise the jury of the proper use of evidence admitted under Evidence Code section 1108, allowed the jury to infer that defendant committed the sexual offenses charged in this case by basing that inference on his prior commission of the uncharged spousal rapes, which he contends were not sufficiently similar to justify the inference.

Specifically, defendant gives two reasons the uncharged spousal rape evidence could not give rise to a rational permissive inference that defendant committed the sexual offenses in this case. He claims: (1) it is irrational to infer a propensity to commit sexual offenses against women other than his wife from the fact that he committed sexual offenses on his wives in the past and (2) it is irrational to infer a propensity to commit the sexual offense of anal penetration from the fact that he committed sexual offenses not involving anal penetration in the past.

To the contrary, the instruction does not allow the jury to draw an irrational inference. (See *People v. Reliford, supra,* 29 Cal.4th at pp. 1012-1016; *People v. Falsetta, supra,* 21 Cal.4th at pp. 910-922.) Even if there are dissimilarities between the prior uncharged offenses and the current offenses, any dissimilarity goes to the weight of the evidence, not to the admissibility of the evidence or constitutionality of the permissive inference.

The inference allowed in this case was consistent with defendant's due process rights relating to permissive inferences. In fact, the California Supreme Court has found that the inference of a propensity to commit sexual offenses reasonably follows from past sexual offenses. In *Reliford*, the court said: "The . . . instruction permits jurors to infer the defendant has a disposition to commit sex crimes from evidence the defendant has committed other sex offenses. The inference is a reasonable one." (*People v. Reliford, supra,* 29 Cal.4th at pp. 1012, fn. omitted.)

17

But defendant argues that we must look more specifically at his uncharged conduct. Doing so, he concludes that the uncharged offenses cannot be used to prove current propensity to commit sexual offenses because they involved spousal rape, which was not the case here. In this regard, he blames the uncharged conduct on his "archaic and outmoded views" that a wife is required to submit to a husband's sexual advances at all times. He also concludes that the uncharged sexual offenses did not involve anal penetration, which occurred in the attack on R.S.

Defendant's argument, however, ignores the ways in which his uncharged conduct was similar to the attacks in this case. In each instance of uncharged conduct, defendant violently attacked his wife and subdued her to commit the sexual offenses. The same is true here. In the uncharged conduct defendant used choking to subdue the victim and commit the sexual offenses. Both victims in this case were choked. In other words, defendant's attacks on his wives were not so dissimilar from the attacks in this case as he would have us believe. In addition to the similarities, the number of times defendant attacked his wives and the number of victims both support an inference that defendant has a propensity to commit sexual offenses.

Based on the similarities in the past and current sexual offenses and the California Supreme Court's holding that it is reasonable to infer from past sexual offenses that a defendant has a propensity to commit sexual offenses, we conclude the permissive inference contained in CALCRIM No. 1191 was not irrational and did not violate defendant's due process rights. There was nothing irrational about inferring from defendant's violent sexual attacks on his wives that he has a propensity to commit sexual offenses.

IV

*CALCRIM No. 302 and Third Party Culpability*

Defendant contends that the trial court diluted the People's burden of proof by giving CALCRIM No. 302, concerning evaluation of conflicting evidence, without

18

separately instructing the jury that a defendant presenting third party culpability evidence need only raise a reasonable doubt concerning his own culpability. He claims that CALCRIM No. 302 may have left an impression in the minds of the jurors that it should allow the third party culpability evidence to raise a reasonable doubt only if that evidence was believable and convincing. We conclude that, even assuming error for the purpose of argument, defendant was not prejudiced by the instructions as given.

During trial, defendant relied on a defense, among others, of third party culpability with respect to the R.S. counts. He argued that Pierce, Nixon, or Meacham committed the crimes.

A defendant need not show beyond a reasonable doubt that a third party was responsible for the crime; instead, a third party culpability defense is successful if it raises a reasonable doubt that defendant was responsible. (*People v. Earp* (1999) 20 Cal.4th 826, 887 (*Earp*).)

The trial court instructed the jury concerning the reasonable doubt standard and about evaluating conflicting evidence. On the latter point, the trial court used CALCRIM No. 302, which states: "If you determine there is a conflict in the evidence, you must decide what evidence, if any, to believe. Do not simply count the number of witnesses who agree or disagree on a point and accept the testimony of the greater number of witnesses. On the other hand, do not disregard the testimony of any witness without a reason or because of prejudice or a desire to favor one side or the other. What is important is whether the testimony or any other evidence convinces you, not just the number of witnesses who testify about a certain point."

The trial court did not instruct specifically on third party culpability evidence. (See *Earp, supra,* 20 Cal.4th 826 at p. 887.)

Defendant argues: "When applied to the issue of third-party culpability, the instruction on evaluating conflicting evidence (CALCRIM No. 302) dilutes the People's burden of proof by suggesting that the jury may credit third party culpability evidence in

19

defendant's favor only if the jury finds that the third party culpability evidence is believable and convincing, and if the evidence fails to convince either way, that the issue can be ignored."

"When reviewing ambiguous instructions, we inquire whether the jury was 'reasonably likely' to have construed them in a manner that violates the defendant's rights. (Cf. *Estelle v. McGuire* (1991) 502 U.S. 62, 72 [116 L.Ed.2d 385].)" (*People v. Rogers* (2006) 39 Cal.4th 826, 873.)

A decision from our state Supreme Court, *Earp, supra,* 20 Cal.4th 826 is helpful in determining whether it is reasonably likely the jury construed CALCRIM No. 302 in a manner that violated defendant's right to have the jury determine his guilt beyond a reasonable doubt. In *Earp*, the court found harmless a trial court's refusal to give a third party culpability instruction (assuming for the sake of argument that the instruction applied). The court reasoned: "The jury was instructed under [the reasonable doubt instruction] that the prosecution had to prove defendant's guilt beyond a reasonable doubt, and the jury knew from defense counsel's argument the defense theory that [the third party], not defendant, had committed the crimes. Under these circumstances, it is not reasonably probable that had the jury been given defendant's proposed [third party culpability] instruction, it would have come to any different conclusion in this case. [Citation.]" (*Earp, supra,* at p. 887.)

The Supreme Court has "held that even if . . . instructions properly pinpoint the theory of third party liability, their omission is not prejudicial because the reasonable doubt instructions give defendants ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof. [Citations.]" (*People v. Hartsch* (2010) 49 Cal.4th 472, 504.)

Similar reasoning applies here, making it unlikely the jury misconstrued the burden of proof. The jury was properly instructed that the People had to prove defendant

guilty beyond a reasonable doubt. The defense at trial was that someone other than defendant was R.S.'s killer. In closing argument, the defense emphasized the presumption of innocence and the beyond-a-reasonable-doubt standard. And counsel argued to the jury that the third party culpability evidence "raise[d] a huge reasonable doubt in this case . . . ."

Defendant's speculation that the jury may have ignored the reasonable-doubt instruction here because of the instruction on how to evaluate conflicting evidence is unconvincing. Therefore, his contention of instructional error is without merit.

V

*Ineffective Assistance of Counsel Concerning Third Party Culpability*

Drawing our attention again to his third party culpability defense, defendant contends that his trial counsel violated his right to counsel by (1) failing to request an instruction on third party culpability and (2) failing to object to comments by the prosecution concerning how to evaluate third party culpability evidence. We conclude that (1) defendant's right to counsel was not violated on the instructional issue because, even assuming counsel should have requested an instruction, the failure to do so was not prejudicial and (2) the prosecutor's remarks were unobjectionable.

"To succeed in a claim of ineffective assistance of counsel, defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and that, but for counsel's error, the outcome of the proceeding, to a reasonable probability, would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 693-694 [80 L.Ed.2d 674]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, the claim on appeal must be rejected unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.)" (*People v. Lawley* (2002) 27 Cal.4th 102, 133, fn. 9.)

21

It is not necessary for the court to examine the performance prong of the test before examining whether the defendant suffered prejudice as a result of counsel's alleged deficiencies. (*Strickland v. Washington, supra,* 466 U.S. at p. 697.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." (*Ibid.*)

A. *Failure to Request Third Party Culpability Instruction*

As noted, the trial court did not instruct the jury specifically as to third party culpability. On appeal, defendant asserts his trial counsel should have requested an instruction. We need not consider whether counsel should have requested an instruction because it is not reasonably probable that the outcome of the proceeding would have been different if counsel had requested the instruction.

As we discussed in connection with defendant's contention that the instructions may have led the jury to apply the wrong standard of proof, the failure to give a pinpoint instruction on third party culpability is harmless. (*People v. Hartsch, supra,* 49 Cal.4th at p. 504.) The reasonable-doubt instruction gave defendant the opportunity to argue, using the third party culpability evidence, that the prosecution did not prove defendant's guilt beyond a reasonable doubt. There is no indication that a separate third party culpability instruction would have made a difference in the verdicts. (*Ibid.*)

B. *Failure to Object to Prosecutor's Comments*

The defense relied on testimony of Lakeshia Whittaker that she heard Nixon say he killed R.S. During closing argument, the prosecutor commented on Whittaker's credibility:

"Lakeshia is an interesting witness. And when we talk about Lakeshia I want to ask you a simple fundamental question that we're going to return to.

"Is Lakeshia Whittaker the type of person that you would rely upon to make an important life decision?"

22

After this comment, the prosecutor spent some time talking about factors affecting Whittaker's credibility, including, among other things, lack of corroboration, bias, drug use, self-interest, and faulty memory.

After this discussion, the prosecutor said:

"So I go back at the end of the day to this. Is Lakeshia Whittaker the type of person that you would rely upon to make an important life decision?

"I'm not talking about some mundane every day decision. I'm talking about a decision where you're at a crossroad in your life: Who to marry. Who not to marry. What career to take. What surgeon to pick to operate on your child. Important life decisions.

"And if you had one of those important life decisions let me ask you, would you rely upon Lakeshia Whittaker to make that important life decision?

"And if your answer is no, then we toss aside what she had to say. You pull up your sleeves and you take a look at the rest of the evidence."

Defendant argues: "The prosecutor's argument that third-party culpability testimony should be rejected unless it meets an 'important life decision' standard misstated the People's burden of proof. It was the People's burden to show that the third-party culpability evidence did not raise a reasonable doubt as to [defendant's] guilt. The prosecutor's argument was an attempt to avoid that burden by arguing that jurors should employ a higher standard in judging the third-party culpability testimony."

In support of his argument that the prosecutor's comments misstated the standard of proof, defendant cites primarily to a case in which the prosecutor actually tried to define the reasonable-doubt standard. (*People v. Nguyen* (1995) 40 Cal.App.4th 28, 36 (*Nguyen*).) In that case, the prosecutor argued: " 'The standard is reasonable doubt. That is the standard in every single criminal case. And the jails and prisons are full, ladies and gentlemen. [¶] It's a very reachable standard that you use every day in your lives when you make important decisions, decisions about whether you want to get

married, decisions that take your life at stake when you change lanes as you're driving.  If you have reasonable doubt that you're going to get in a car accident, you don't change lanes.' " (*Id*. at p. 35.)

The *Nguyen* court "strongly disapprove[d]" of these statements suggesting the reasonable doubt standard is used in daily life.  (*Nguyen, supra*, 40 Cal.App.4th at p. 36.)

Unlike the prosecutor's comments in *Nguyen*, the prosecutor's comments here focused exclusively on Whittaker's credibility.  In that sphere, they were nothing more than unobjectionable argument concerning whether the jury should believe Whittaker.  (See *People v. Dennis* (1998) 17 Cal.4th 468, 522 [prosecutor's have wide latitude to discuss and attack witness credibility].)  The prosecutor's comments did not broach the reasonable-doubt standard.  And any objection to the comments as misstating the standard of proof would have been overruled.

Even in *Nguyen*, however, the court held that the prosecutor's improper attempt to define reasonable doubt was harmless because the court properly defined the standard for the jury.  (*Nguyen, supra,* 40 Cal.App.4th 28 at pp. 36-37.)  The same is true here.  The trial court properly defined the reasonable-doubt standard (CALCRIM No. 220) and gave the jury direction on how to evaluate witness credibility (CALCRIM No. 226).  Also, the court instructed the jury that, if the attorneys' statements about the law conflicted with the court's instructions, the jury was to follow the court's instructions.  (CALCRIM No. 200.)  There is no indication in this record that the jury misunderstood the reasonable-doubt standard or its application to this case.  Therefore, even if the prosecutor's comments had been stricken and the jury admonished, it is not reasonably probable defendant would have obtained a better result.

Defendant's contention that trial counsel violated his right to counsel with respect to third party culpability issues is without merit.

24

*Sufficiency of Evidence Concerning Defendant's Mental State*

Defendant contends that there was insufficient evidence to sustain the convictions in counts four through nine against T.T. because she pretended to consent to the sexual activity and caused him to actually and reasonably believe, though mistakenly, that she consented. We conclude that the evidence was sufficient for the jury to determine that defendant (1) did not actually believe T.T. consented and (2), even if he so believed, the belief was unreasonable under the circumstances.

A reasonable and good faith but mistaken belief that a person consented to sexual activity is a defense to some sexual offenses, such as rape. (*People v. Mayberry* (1975) 15 Cal.3d 143, 153-158 (*Mayberry*).) "The *Mayberry* defense has two components, one subjective, and one objective. The subjective component asks whether the defendant honestly and in good faith, albeit mistakenly, believed that the victim consented to [the sexual activity]. In order to satisfy this component, a defendant must adduce evidence of the victim's equivocal conduct on the basis of which he erroneously believed there was consent. [¶] In addition, the defendant must satisfy the objective component, which asks whether the defendant's mistake regarding consent was reasonable under the circumstances. Thus, regardless of how strongly a defendant may subjectively believe a person has consented to [the sexual activity], that belief must be formed under circumstances society will tolerate as reasonable in order for the defendant to have adduced substantial evidence giving rise to a *Mayberry* instruction. [Citations.]" (*People v. Williams* (1992) 4 Cal.4th 354, 360-361, fn. omitted.)

The trial court instructed the jury that "[t]he defendant is not guilty of forcible sexual penetration if he actually and reasonably believed that the other person consented to the act. The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the other person consented. If the

25

People have not met this burden, you must find the defendant not guilty." The court gave the same instruction with respect to oral copulation and rape.

Marshalling the evidence of what happened only after he first entered T.T.'s apartment in the middle of the night, attacked her, choked her, forced her to the floor, and orally copulated her, defendant argues that the evidence was insufficient for the jury to conclude that T.T. did not consent to the later sexual activity. He therefore claims that there is insufficient evidence to support the convictions for sexual penetration and rape of T.T. as alleged in counts four through nine.

We consider all of the evidence in the light most favorable to the prosecution in determining whether it was sufficient to sustain the convictions. (*Farnam, supra,* 28 Cal.4th at pp. 142-143.)

A friend introduced defendant to T.T. in October 2010. At approximately 3:00 in the morning on Thanksgiving, defendant knocked on T.T.'s apartment door. T.T., who was doing housework at the time, asked through the door who was there. Defendant, who was acquainted with T.T., identified himself and said that he was there about a debt T.T. owed to a neighbor. T.T. let defendant into the apartment.

After the two talked for about a minute, defendant grabbed T.T. by the throat, said, "Bitch, you're gonna give me some pussy," and threw her against the wall. T.T. was scared because defendant was bigger and stronger. Defendant threw T.T. to the floor, told her to take her pants off, had her pull her shirt up above her breasts, told her to keep her hands on her breasts, and then he orally copulated her.

Going into "survival mode," T.T. tried to assure defendant that everything was okay. They went to the couch, where defendant put his finger in T.T.'s vagina more than once. T.T. asked him not to do that.

Defendant told T.T. to orally copulate him. She did not want to, but she complied. When she first started, he let her believe that she was not doing it right when he said,

26

"[S]ee, you don't like me."  She then, in her words, "proceeded to do it right."  She was afraid that, if she did not do it that way, he would hurt her.

More than once, defendant inserted his penis into T.T.'s vagina.

At one point, defendant had gone into the bathroom.  Using the word "hon" to refer to him, she asked where he was.  She also rubbed his shoulders and asked defendant what he wanted with an "old cougar" like her.  (T.T. was 54 years old at the time of defendant's crimes, while defendant was 31.)  She spoke that way trying to convince him that everything was okay so that he would not hurt her.

T.T. acted like they were on a date, but that appears to have been after the sexual activity.  Defendant told her he wanted to be her "man," and T.T. told him he could move in.

At approximately 6:00 a.m., while defendant was still in T.T.'s apartment, four people came into the apartment at different times.  T.T. did not seek help from them because the rape had already happened and she did not want to get them involved.  She also wanted to maintain defendant's trust.

Defendant eventually left and, two days later, T.T. went to the hospital and reported that she had been raped.

Defendant is six feet tall and weighs 250 pounds.  Although there was no direct evidence of T.T.'s size, she testified that defendant was able to subdue her quickly when he first attacked her.  Therefore, we may infer that she was smaller and weaker.

Around December 22, defendant returned to T.T.'s apartment.  T.T. refused to open the door, but defendant said he wanted to "bless" her and to apologize.

Defendant testified that in October, T.T. had said she thought defendant was sexy.  In exchange for methamphetamine, T.T. orally copulated defendant on that occasion.  The night before Thanksgiving he went to T.T.'s apartment.  They got high on methamphetamine and had oral sex.  They tried but were unable to have vaginal sex

27

because defendant was high and could not maintain an erection. Defendant claimed he did not threaten T.T. or use violence.

Defendant argues that (1) because T.T. tried to make him believe that she consented to the sexual activity after the initial attack and oral copulation and (2) he used no further violence to get T.T. to submit to sexual activity (see *People v. Ireland* (2010) 188 Cal.App.4th 328, 337-338 [violence after initial consent may negate consent]), no rational trier of fact could have found that he did not believe that T.T. consented to the acts charged in counts four through nine. We disagree because (1) the testimony does not necessarily support defendant's view that T.T.'s efforts to make defendant think she was consenting came before or during the sexual activity charged in counts four through nine and (2) there was sufficient evidence to support the jury's determination that defendant's belief was unreasonable.

Viewing the evidence in the light most favorable to the verdict, it appears that T.T.'s efforts to make defendant think everything was okay came after the sexual activity. Her rubbing his shoulders, calling him "hon," and asking him to move in with her appears to have occurred after the sexual activity. Therefore, it could not have had an effect on his belief during the sexual activity.

In any event, the evidence was sufficient for the jury to conclude that defendant could not reasonably have believed that T.T. consented to the sexual activity charged in counts four through nine. Defendant, much bigger and stronger than T.T., went to T.T.'s apartment in the middle of the night. When he was let in on a ruse, he almost immediately attacked her violently, choking her, pushing her up against the wall, and then forcing her to the floor before orally copulating her. Any reasonable person would understand that this behavior would have the effect of overcoming the will of a smaller, weaker, vulnerable person in those circumstances. (See *People v. Griffin* (2004) 33 Cal.4th 1015, 1027-1028 [force served to overcome will of victim to thwart or resist the

28

attack].)  Thus, defendant could not use T.T.'s acquiescence, and even apparent consent, to avoid criminal liability for the sexual offenses charged in counts four through nine.

Under these facts, defendant was not entitled to have the jury accept his *Mayberry* defense.  In other words, there was sufficient evidence to sustain the jury's finding that either (1) defendant did not actually believe T.T. consented to the sexual activity charged in counts four through nine or (2), if he actually believed T.T. consented, the belief was unreasonable under the circumstances.

Defendant also claims that, because T.T. "tried to communicate to him, through words and behavior, that she did consent, . . . [i]t was the People's burden to prove that her efforts were unsuccessful, and that [defendant] was able to see through her act and knew that she did not consent."

Defendant is mistaken.  Even if T.T. succeeded in making defendant think that she consented, defendant's belief was a defense under *Mayberry* only if it was reasonable under an objective analysis.  Here, considering the evidence in the light most favorable to the prosecution, defendant's belief in consent, if he had such a belief, was unreasonable. It appears that any such belief was also untimely because T.T.'s efforts to make defendant believe everything was okay came after the sexual offenses had been committed.

## VII

### *Sufficiency of Evidence of Two Acts of Oral Copulation*

After T.T. began orally copulating defendant, he asked her to change the way she was doing it.  She complied and proceeded to do it "right" "because [she] didn't want [defendant] to think that [she] wasn't liking what [she] was doing."  The jury convicted defendant of two counts of oral copulation based on these facts.  On appeal, defendant contends there was insufficient evidence to support two different counts of oral copulation in counts five and six because there was not a sufficient break between the two acts.  To the contrary, the evidence that T.T. changed the manner in which she was

29

orally copulating defendant supported the jury's verdicts. Defendant also contends that, even if the evidence supported two different counts, section 654 prohibited punishment on both counts. Again, defendant's contention is without merit.

A.    *Multiple Convictions*

To support his argument that there was no break in the oral copulation sufficient to support two convictions for oral copulation in counts five and six, defendant cites cases in which the evidence was found to be sufficient when a perpetrator stopped and then resumed a sexual attack. (See *People v. Scott* (1994) 9 Cal.4th 331, 345 [defendant's finger dislodged then reinserted in vagina]; *People v. Harrison* (1989) 48 Cal.3d 321, 329 [defendant stopped then resumed]; *People v. Marks* (1986) 184 Cal.App.3d 458 [two sodomies for two insertions].) Those cases, however, involve facts dissimilar to this case.

The facts of this case are similar to the facts of another case in which the court found sufficient evidence to support multiple convictions. (*People v. Catelli* (1991) 227 Cal.App.3d 1434, 1446 (*Catelli*).) In *Catelli*, the defendant forced one victim to suck his penis while another licked his scrotum. He then had them change places. (*Ibid.*) Rejecting the argument that these facts did not support two counts of oral copulation as to each victim, the court said: "First, [defendant] asserts that 'merely changing the location of copulation that occurs on the same organ, without interruption, cannot constitute separate offenses.' In support of this contention, defendant 'maintains that a man's scrotum *and* penis constitute the male "sexual organ" for purposes of section 288a. Accordingly, any uninterrupted act of copulating different parts of a man's "sexual organ" constitutes but a single offense.' (Italics in original.) [¶] The flaw in defendant's argument is that the acts were not uninterrupted. Rather, they were separated in time and by a change in position. It is now settled that an accused may be convicted for multiple, nonconsensual sex acts of an identical nature which follow one another in quick,

30

uninterrupted succession.  (*People v. Harrison*[, *supra*,] 48 Cal.3d [at pp.] 327-334.)"
(*Catelli, supra,* at p. 1446.)

Defendant argues that *Catelli* does not support the jury's verdicts in this case because, in defendant's words, "there must be a break in the oral-genital contact (ending one offense) and a reestablishment of contact (beginning another offense)."  Defendant's argument is unconvincing because in *Catelli* there was no direct evidence of a break in the victims' contact with the defendant's genitals, even though it can be inferred from the changing of positions.  The same is true in this case.  The evidence was sufficient to allow the jury to infer that, in changing the manner in which T.T. was orally copulating defendant, the requisite break took place sufficient to justify conviction on two counts.

T.T. testified that defendant directed her to orally copulate him.  She began, and defendant said "[S]ee, you don't like me."  T.T. then changed the manner in which she was orally copulating defendant.  The jury could reasonably infer that this sequence (beginning, communication about the manner, then changing of the manner) included a break in the oral copulation.

Therefore, the facts supported two convictions for oral copulation in counts five and six.

B.     *Section 654*

Defendant also argues that, even if there was sufficient evidence for two oral copulation convictions in counts five and six, section 654 prohibits punishment on both counts because they were based on the same indivisible act.  This argument is without merit because they were not based on the same indivisible act; instead, they were based on the first act of oral copulation and the later change in the manner of oral copulation.

Section 654, subdivision (a) states, in part:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  The general rule in sex cases is

31

that section 654 does not apply to separate sexual acts perpetrated against a victim occurring during a single encounter. (*People v. Harrison, supra,* 48 Cal.3d at pp. 334-337.)

Here, as discussed, the two oral copulations charged in counts five and six were separate acts divided by a break when T.T. complied with defendant's encouragement to change the manner in which she was orally copulating him. Therefore, section 654 does not prohibit separate punishment for each conviction.

VIII

*Ineffective Assistance of Counsel Concerning Hearsay*

Defendant was charged with three counts of rape against T.T. (counts seven, eight, and nine). T.T. testified that defendant inserted his penis in her vagina more than once, but when the prosecutor asked her whether he had inserted his penis more than five times she said she could not remember. The prosecutor made no effort to have T.T. be more specific about whether defendant raped her three times.

Later, the prosecution had Detective Elaine Stoops testify that T.T. told her that defendant inserted his penis in T.T.'s vagina five times. Defense counsel did not object to this testimony as hearsay.

On appeal, defendant contends his trial attorney violated his right to counsel by failing to object to Detective Stoops's testimony as hearsay. He argues that it was inadmissible hearsay because T.T.'s prior statement to Detective Stoops that defendant raped her five times was not inconsistent with her testimony at trial that she could not remember. We agree. Defense counsel should have objected and prevented the prosecution from presenting Detective Stoops's testimony. Without that testimony, there would have been no evidence that defendant raped T.T. more than twice.

Under Evidence Code section 1235, a witness's prior statement is not made inadmissible by the hearsay rule if it is inconsistent with that witness's testimony at trial. However, Evidence Code section 1235 does not apply when a witness merely does not

32

remember the event, or details about the event, that she previously described. (*People v. Sapp* (2003) 31 Cal.4th 240, 296.) When a witness genuinely does not remember the event or its details, the prior statement is not inconsistent and is not admissible under Evidence Code section 1235. (*People v. Gunder* (2007) 151 Cal.App.4th 412, 418; *People v. Sam* (1969) 71 Cal.2d 194, 208-210.)

But this rule prohibiting application of Evidence Code section 1235 to the prior statements of a forgetful witness does not apply if the witness is deliberately evasive or feigns a lack of memory at trial. As the Supreme Court explained in *People v. Green* (1971) 3 Cal.3d 981, at page 988, "[J]ustice will not be promoted by a ritualistic invocation of this rule of evidence. Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement [citation], and the same principle governs the case of the forgetful witness." Thus, "the true rule under *Green* is that a witness' prior statements are admissible so long as there is a reasonable basis in the record for concluding that the witness' 'I don't remember' responses are evasive and untruthful." (*People v. O'Quinn* (1980) 109 Cal.App.3d 219, 225.)

Here, the Attorney General acknowledges that "there is no reason to conclude that [T.T.] used memory loss as an attempt to be evasive or untruthful during her trial testimony." Nonetheless, the Attorney General argues that, considering T.T.'s testimony as a whole, her statement that she did not remember whether defendant raped her more than five times was inconsistent "in effect" with her prior statement to Detective Stoops that defendant raped her five times. We see no logic in this position because it would eliminate the need to establish inconsistency. Under the stated authorities, T.T.'s nonevasive testimony at trial that she could not remember whether defendant raped her more than five times was not inconsistent with her prior statement to Detective Stoops that defendant raped her five times. If trial counsel had objected to Detective Stoops's testimony based on hearsay, the objection would have been sustained, and there would have been no evidence that defendant raped T.T. any more than twice.

33

Trial counsel's failure to object fell below an objective standard of reasonableness under prevailing professional norms and, but for the failure to object, defendant would not have been convicted of any more than two counts of rape. Since there is no satisfactory explanation for the failure to object, we must reverse the conviction on count nine, the third rape. (See *People v. Lawley, supra,* 27 Cal.4th at p. 133, fn. 9.) Also, because without Detective Stoops's testimony there would have been insufficient evidence of the third rape, count nine cannot be retried. (See *People v. Williams* (2013) 218 Cal.App.4th 1038, 1059.)

IX

*CALCRIM No. 318*

Defendant contends that the trial court erred by using CALCRIM No. 318 to instruct the jury concerning prior inconsistent statements because the instruction did not inform the jury that it was required to determine whether T.T.'s prior statement (her statement to Detective Stoops concerning the number of times she was raped) was inconsistent with T.T.'s testimony at trial. He argues that the alleged misinstruction was prejudicial because it resulted in improper use of T.T.'s prior statement to support conviction on count nine.

Because we have already determined that the conviction on count nine must be reversed, we need not consider this contention of instructional error because the only prejudice alleged by defendant is conviction on count nine.

DISPOSITION

The conviction as to count nine is reversed and dismissed. The sentence for that count, a consecutive term of 15 years to life, is struck. As modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment and to send it to the Department of Corrections and Rehabilitation. Pursuant to Business and Professions Code section 6086.7, subdivision (a)(2), the clerk of this court is ordered to forward a copy of this opinion to the State Bar upon finality of this appeal. Further,

34

pursuant to Business and Professions Code section 6086.7, subdivision (b), the clerk of this court shall notify defendant's trial counsel that the matter has been referred to the State Bar.

      NICHOLSON      , Acting P. J.

We concur:

      HULL           , J.

      MURRAY        , J.